UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CARL E. ROSE, | ) | |
| | ) | |
| DREW RODGERS-ROSE, | ) | |
| | ) | |
| *individually and as next friends of* | ) | |
| *their minor daughter N.R.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-00035 |
| | ) | |
| SHERIFF WES DRURY, | ) | **PLAINTIFFS DEMAND** |
| | ) | **JURY TRIAL** |
| CHIEF DEPUTY RON MEREDITH, | ) | |
| | ) | |
| ATTORNEY PHIL R. DORMEYER, | ) | |
| | ) | |
| JOHN CAUDLE, | ) | |
| | ) | |
| *in their individual capacities,* | ) | |
| | ) | |
| SCOTT COUNTY, MISSOURI, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>Complaint, Civil Rights, 42 U.S.C. § 1983, for Damages<br>for Unconstitutional Search and Seizure</u>

Plaintiffs Carl Rose and Drew Rodgers-Rose, individually and as next friends of their minor daughter N.R., by undersigned counsel, state as follows for their Complaint, 42 U.S.C. § 1983, for damages against defendants Sheriff Wes Drury, Chief Deputy Ron Meredith, Attorney Phil R. Dormeyer, John Caudle, and Scott County, Missouri:

## Introduction

1.      This case arises out of a dispute between former political rivals for the elected Scott County, Missouri offices of Sheriff and Coroner, and a second dispute between business partners.  It is a federal civil rights matter only because an elected Sheriff permitted a third-party civilian running for office and his private, civil attorney, accompanied by the civilian's campaign workers and family members, to perform a clearly-established unconstitutional search and seizure of what they knew to be marital property and third-party separate property from a family home, not to properly satisfy a civil judgment, but to humiliate and harm its owners.

2.      Plaintiff Carl Rose was individually embroiled in litigation after being sued by his business partner John Caudle, who had become a political rival for the Scott County Coroner's Office.  Abandoned by his legal counsel on the eve of a bench trial, Rose was forced to go forward *pro se*, lost, and had a civil judgment entered against him.  Scott County Sheriff Wes Drury and Chief Deputy Ron Meredith personally oversaw an execution of the judgment at Rose's family home, permitting Caudle's civil attorney Phil Dormeyer and Caudle to direct the search and seizure of marital property belonging to Rose and his husband Drew Rodgers-Rose, as well as separate property belonging to their minor daughter N.R.  Rose and Rodgers-Rose claim §1983 damages for themselves and their daughter N.R.

## Parties

3.      Carl Rose is, and was at all times relevant to this suit, a resident of Scott County, Missouri, where he lives with his husband Drew Rodgers-Rose and their daughter N.R.  Rose owned businesses in the funeral and horse sectors, and was a former Scott County Sheriff's deputy and former candidate for Scott County Coroner.

4.      Drew Rodgers-Rose is Rose's husband, and resides with Rose and their daughter N.R.

5.      Rose and Rodgers-Rose are individual plaintiffs as a married couple and as tenants by the entirety.  They are also plaintiff as next friends of their minor daughter N.R., who is a real party in interest and who proceeds in this litigation by her initials to protect her identity.  Fed. R. Civ. P. 5.2(a)(3); Fed R. Civ. P. 17(c)(2).

6.      Defendant Wes Drury was at all relevant times the elected Sheriff for Scott County, Missouri.  Plaintiffs sue Sheriff Drury in his individual capacity.  Plaintiffs also sue Scott County for knowing policymaker actions by Sheriff Drury in his official capacity.  Sheriff Drury lost his primary election in the August 2024 election, and his term ended on January 1, 2025.Defendant Ron Meredith was at all relevant times the Chief Deputy Sheriff for Scott County, Missouri. Plaintiffs sue Chief Deputy Meredith in his individual capacity only.

7.      Defendant Phil R. Dormeyer of the Statler Law Firm was at all relevant times the private attorney for Rose's former business partner and political rival John Caudle.  At all relevant times, Dormeyer was acting within the course and scope of his representation of John Caudle as Caudle's attorney.  Plaintiffs sue Dormeyer in his individual capacity.

8.      Defendant John Caudle was at all relevant times Rose's former business partner and political rival John Caudle.  Plaintiffs sue Caudle in his individual capacity.

9.      Defendant Scott County, Missouri is a properly formed political subdivision of the State of Missouri.

## Jurisdiction and Venue

10.     Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988; and the Fourth Amendment to the United States Constitution.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Venue in this Court is proper under 28 U.S.C. § 1391 because each defendant carried out his relevant acts within Scott County, Missouri, which is within the Southeastern Division of this Court.

### Color of State Law

13.     At all relevant times, each defendant acted under color of state law.  Particularly, at all relevant times, each defendant acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Missouri.

### Jury Demand

14.     Plaintiffs demand jury trial on their claims for damages.

### Facts

### Background

15.     Carl Rose was a Sikeston Department of Public Safety police officer from 2011 to 2013.  Subsequently Rose was a Scott County Sheriff's Deputy from 2013 to 2019.  In 2018, he was the Sheriff's Department employee of the year.  In 2019, however, Sheriff Drury fired Rose after Rose filed paperwork to run against Sheriff Drury for the elected office of Sheriff.  Rose publicly alleged that Sheriff Drury fired him as retaliation for running against him.  Sheriff Drury denied this.  Rose ultimately dropped out of the Sheriff's race.

16.     Rose subsequently worked in the horse business, owning R&R Performance Equine, LLC.  He also formed Southern Funeral Services, Inc. and 2BF Properties, LLC with business partner John Caudle to acquire two funeral homes and real estate in Sikeston (Scott County) and East Prairie (Mississippi County).  Rose and Caudle were 50/50 owners of each of the two business entities, and each had director, officer and/or manager positions with each entity, per each entity's shareholders agreement and operating agreement respectively.

4

17.    Rose was also the Republican candidate for Scott County Coroner in the November 2020 election.  Rose did not win that race.

18.    Rose and Caudle subsequently had a falling out over their funeral business in 2022 and 2023, related to Rose's purchase of two company vehicles and use of company funds.

19.    Based on their business dispute, Caudle individually and the two entities jointly filed a civil lawsuit against Rose in Scott County Circuit Court, No. 23SO-CV00115, on February 20, 2023, seeking an injunction and other equitable relief.  Caudle and the two entities were represented by civil attorney Phil Dormeyer, who was paid at least in part with corporate funds by business checks issued by the Southern Funeral entity.[1]

20.    The parties agreed to a consent preliminary injunction with the Scott County court entered on December 6, 2023.  The injunction held in relevant part:

> A.    Defendant [Rose] or anyone acting in concert with him is and shall continue to be restrained and enjoined from accessing, obtaining, distributing, or using in any way, any of Plaintiffs' [Caudle and the two business entities'] assets, debt accounts, or company information, until further Order of Court.
>
> B.    Defendant [Rose] or anyone acting in concert with him is and shall continue to be restrained and enjoined from further acting in any capacity as a Director, Officer, Member, Employee, or in any other capacity on behalf of Plaintiffs [Caudle and the two business entities], until further Order of Court.
>
> C. Defendant [Rose] or anyone acting in concert with him is and shall continue to be restrained and enjoined from entering Plaintiffs' [Caudle and the two business entities'] premises or from accessing any company information, accounts, online accounts, assets, debts, or any other information regarding Plaintiffs' [Caudle and the two business entities'] company and business operations, until further Order of Court.

---

[1] Representing one 50/50 shareholder and LLC member and director/officer/manager, as well as the two business entities themselves, appears to be a conflict of interest for Attorney Dormeyer since Rose never consented to Dormeyer representing the two business entities, much less to Dormeyer being paid out of business entity funds.  Since each business entity's consent to the dual representation is required by Missouri Rule of Professional Responsibility 4-1.7, then Rule 4-1.13(e) requires that the consent be given by an appropriate official of the company other than the shareholder and director/officer who is seeking the representation.

D. Defendant [Rose] shall return to Plaintiffs [Caudle and the two business entities] any and all information and property belonging to Plaintiffs [Caudle and the two business entities], including but not limited to user names, passwords, keys, and all information pertaining to Plaintiffs' [Caudle and the two business entities'] customers, all business methods or strategies, monies, profit, cost, accounting records, and sales information, and any other confidential or proprietary information belonging to Plaintiffs [Caudle and the two business entities] and for the Court to Order that such information and property be purged from Defendant [Rose] within forty-eight (48) hours' of the date this Judgment and Order is signed by the Court, and all such information and property shall be returned by Defendant [Rose] immediately to Plaintiffs [Caudle and the two business entities].

21.    The parties subsequently disagreed whether Rose complied with Section D of that injunction insofar as it required Rose to turn over company email addresses and property.

22.    On February 23, 2024, Caudle filed paperwork announcing his intention to run for Scott County Coroner in the 2024 elections.

23.    That same day, a special prosecutor from Dunklin County charged Rose with felony criminal conduct related to the vehicle and other financial transactions in Rose's business dispute with Caudle.  The timing was suspicious as it appeared to be coordinated by Caudle and Drury, who were Rose's political rivals, to help Caudle's candidacy.  *See State v. Rose,* No. 24SO-CR00188 (Scott County Circuit Court, Missouri).[2]

24.     The criminal case appears to be wildly overcharged with 47 felony counts and 3 misdemeanor counts, essentially seeking to criminalize what would otherwise normally be a run-

---

[2]  Scott County Associate Circuit Judge Zac Horack subsequently recused himself on his own motion, and the case has since been moved on a change of venue to Judge Kacey Proctor in Butler County, Missouri.  *See* No. 24SO-CR00188-01.

of-the-mill civil matter that at its core is nothing more than a business dispute between political rivals over business transactions made by one of two co-owners and equal partners.[3]

25.    Rose's civil case arising out of the same dispute, however, was set for hearing at the request of Caudle on April 11, 2024.  Shortly before that scheduled hearing, Rose's counsel suggested that they would withdraw and instructed Rose to move for a continuance, so that he could buy time, and avoid having to testify in order to protect his Fifth Amendment privilege in the criminal case.  Accordingly, on March 25, 2024, Rose's counsel moved to withdraw, and on April 3 and 4 filed duplicative motions to continue the hearing as Rose's counsel was withdrawing from the case and therefore unavailable.

26.    The Court in the civil case granted Rose's counsel's motion to withdraw, but denied Rose's motion for a continuance.  Accordingly, Rose appeared *pro se* on April 11 for the hearing.  Rose attempted to continue the hearing again.  That Court denied that motion, forcing Rose to proceed wholly unprepared and without counsel against Dormeyer, an experienced attorney.  Rose attended the hearing and made several unsuccessful attempts to object. Frustrated, he did not return after lunch.

27.    The Court in the civil case made the following docket entry on April 11:

> [Caudle] appears in person and by counsel Phil Dormeyer.  Defendant [Rose] appears in person and pro se.  The Defendant requests that the case be continued. Phil Dormeyer objects to the continuance. The Court denies the Defendant [Rose]'s request to continue.  The Court takes up the matter for hearing. Witnesses sworn. At the end of Plaintiff John Caudle's testimony through direct examination, the court takes an approximate 50 minute break for lunch. Prior to recessing for lunch, the Court tells the parties to be back in the courtroom at 1:00pm, announcing that the trial will resume at 1:00pm with Defendant's cross examination of John Caudle.  When the court resumes at 1:00 pm, [Caudle] and his counsel appear, however, the Defendant [Rose] does not appear.   The Court

---

[3] It would appear that over half of Americans and over half of Scott County voters would agree that business records transactions can be overcharged.  *See generally People of the State of New York v. Donald J. Trump,* Ind. No. 71543/23 (New York County Supreme Court, New York).

gives the Defendant [Rose] an additional 5 minutes before proceeding.  The Defendant still has not returned.  The Court proceeds with the hearing.  [Caudle]'s additional witnesses sworn in and testimony presented.    [Caudle]'s exhibits admitted into evidence.  [Caudle] withdraws his Motion for Unavailable Witness to Testify on an Alternate Date.  [Caudle] rests.  Cause taken under advisement.  *** The hearing does not conclude until approximately 3:45 p.m., and Defendant never returns*** SO ORDERED: 04/11/2024 Honorable Julia M. Koester

28.     On May 10, 2024, the Court entered a civil Judgment in favor of Caudle and against Rose, holding that Rose had not complied with Section D the December 2023 consent injunction insofar as he had not returned all property and information (although the Judgment did not specify that with particularity), that Rose had violated various fiduciary duties to Caudle and the two entities, that he had forged loan documents for the two business vehicles, and that he had diverted business funds for personal use.

29.     The civil Judgment was drafted by Caudle's attorney Phil Dormeyer.

30.     The civil Judgment was for $396,664.86, plus a sanction of $10,000 for violating the consent injunction, plus attorney's fees of $38,919.48.  It is unclear why the civil Court awarded fees since it did not identify either a statutory or a contractual basis to depart from the American Rule as to fees.

31.     Rose, naturally, disputes these findings and has filed an appeal in the Missouri Court of Appeals for the Southern District, No. SD38599.  While the appeal was dismissed as untimely, Rose has filed a motion for leave to file an untimely appeal, No. SD38645, which is the proper procedural mechanism, particularly for a *pro se* litigant.

32.     Since the civil Judgment issued, Caudle sought to collect, through his attorney Phil Dormeyer filing garnishment applications to five local banks, and obtaining an Execution application.

**The July 12, 2024 Search and Seizure**

33.     On July 12, 2024, Rose was sitting in his truck at the entrance to the driveway to his family home at 106 Jennings Lane in Sikeston, reviewing mail that a postal worker had just delivered.  Scott County Detective Mike Williams approached the window of Rose's truck, startling Rose.  Detective Williams informed Rose that Scott County Chief Deputy Ron Meredith was on his way with some papers.  Detective Williams asked Rose to pull up the driveway.  Rose and Williams—who knew each other from Rose's days at Sikeston DPS—exchanged pleasant chitchat about Rose's truck.

34.     A few minutes later, several unmarked vehicles pulled up, parking variously in Rose's driveway or out on the roadside.  Sheriff Drury and Chief Deputy Meredith approached Rose and gave him two copies of the Execution paperwork from the civil Judgment.  *See* Exhibit 1 (Execution Application and Order, and Exhibits A through C thereto) and Exhibit 2 (Judgment and Order for Entry on Premises to Levy against Defendant's Personal Property).

35.     The Execution Application and Order was completed and electronically signed by Dormeyer, and described the property to be seized as:

> All Debtor's property at 106 Jennings Lane, Sikeston, MO 63801, including Debtor's personal property in Debtor's possession, money, all tangible property, riding lawn mower, firearms, furniture, jewelry, appliances, horses, saddles, foals, and horse semen, see EX. A 2022 GMC DENALI CREW CAB VIN 1GT49WBY9NF17139J and any other motor vehicle in debtor's name, see EX. B.  All Debtor's interest and share in any business owned by Carl E. Rose, see EX. C.

36.     The Judgment was signed by the Court in the civil case.  The Judgment stated:

> IT IS HEREBY, ORDERED, ADJUDGED AND DECREED THAT upon entry of the Execution  Application and Order, filed contemporaneously with  the  Court,  that the Scott County Sheriff may enter upon the premises of 106 Jennings Lane, Sikeston MO, 63801, including but not limited to, entry into the residential premises, to levy Defendant's personal property to satisfy Judgment; and, that the Scott  County  Sheriff  may

> enter onto the premises of and 10 Jennings Lane, Sikeston, MO, 63801 to levy Defendant's personal property, including horses, vehicles, and personal property kept on the premises of 110 Jennings Lane, Sikeston, Missouri to satisfy Judgment.

37.     Rose did not own 110 Jennings Lane; rather it was the home of the owner of another horse company for which Rose now works.

38.     Dormeyer on behalf of Caudle and the business entities had done no discovery on Rose nor identified individual assets of Rose's that would be properly subject to execution and collection, such as propounding Debtor Interrogatories or Requests for Production, let alone conducting a Debtor Examination. *See, e.g.,* Missouri Rule 72.27.

39.     Chief Deputy Meredith, standing alongside Sheriff Drury, stated to Rose that he had never had this type of execution in 35 years, and that he "wasn't real sure on what or how to proceed," but stated attorney Dormeyer had filed a writ of execution to take Rose's property. Rose asked several times specifically what property was to be seized pursuant to the seizure order, and Sheriff Drury replied that he wasn't exactly sure, but that attorney Dormeyer and his client Caudle were coming and that Rose would find out once they got there. Sheriff Drury and Chief Deputy Meredith stated "for sure they would be taking the truck."

40.     At this point, Rose's husband Rodgers-Rose came outside as he had been trying to call Rose; meanwhile, Rose tried to call his criminal defense attorney Jacob Zimmerman for advice. Chief Deputy Meredith explained to Rodgers-Rose that there had been a delay with the Sheriff's Department as they did not know exactly how to proceed since they had never seen this type of Execution order. Indeed, the Sheriff's Department had contacted the Scott County Prosecuting Attorney and the Scott County Attorney to seek legal advice.

41.     Dormeyer then arrived, and advised Rose that he would be taking "everything" per the Execution order, and that Rose needed to surrender the keys to Rose's truck.

42.     Rose's truck, however, had a superior lien on its title from Rose's lender, First State Community Bank Sikeston.  Rose contacted an official at the bank, who stated that they would come and take possession of the truck as first lienholder.

43.     Dormeyer, when told of this, stated that the bank would not be allowed to take Rose's truck, and that either Rose could give the truck keys to him, or he would have the truck dragged out of the drive by a tow company and Rose would have to pay the tow bill along with pay for any damages the truck would likely occur during removal.  Under pressure, Rose gave Dormeyer the spare key to the truck.

44.     At this point, Chief Deputy Meredith stated that "they" would go through Rose's family residence with go pro cameras and film everything before anyone was allowed in and to take photographs.   It was unclear who "they" referred to, but at this point in time, the following persons were present from the Sheriff Department: Sheriff Drury, Chief Deputy Meredith, Detective Williams, and Captain Danny Finley.

45.     Just then, however, Caudle and several other civilians arrived at Rose's family residence.  Caudle and the other civilians were wearing "Caudle for Coroner[4]" election tee shirts.  On information, the other civilians were Cheyenne Caudle-Parks (Caudle's sister), Tyler Masters, Scott Riley, Justin Scapino, Tammy R Belt Chandler, and a man named Garrett (collectively the "Caudle civilians").

46.     Rose told Sheriff Drury that he would under no circumstances allow Caudle on his property, nor any of the other civilians who accompanied him.  Sheriff Drury responded: "well this will take a lot longer then."

---

[4] Rose ran for Coroner in 2020, and lost by 204 votes.  Rose was planning to run again in 2024 until he was arrested for his alleged conduct against Caudle.

47.     Chief Deputy Merideth and Captain Williams went through the Rose family home taking video and photographs.

48.     Rodgers-Rose told Sheriff Drury and Chief Deputy Merideth that the property inside the family home was not the separate or individual property of Rose, but rather marital property belonging to both Rose and his husband Rodger-Rose.

49.     Once the inventory was complete, Dormeyer and the Caudle civilians (other than Caudle himself) entered the home.  Rose witnessed that Dormeyer acted like he was shopping, instructing the Caudle civilians on which items to take.

50.     At no point did Rose or Rodgers-Rose consent or acquiesce to the search and seizure by Dormeyer and the Caudle civilians and in fact explicitly and overtly objected to the proceedings multiple times.

51.     Rose informed Dormeyer that certain items were separate property belonging to Rose and Rodgers-Rose's daughter N.R. For example, there was pink horse-riding tack obviously suitable only for a young girl.

52.     Rose also informed Dormeyer that other items were separate and inherited property belonging to Abigail Madigan, a former legal ward of Rose and Rodgers-Rose who was now an adult.  For example, Madigan was storing a bedroom set and baseball cards that she had inherited from her grandmother at the Rose and Rodgers-Rose' family home.

53.     In other words, Dormeyer was on notice that all of the property inside that home that he was directing people to seize was either marital property belonging to Rose and Rodgers-Rose, or separate property belonging to their daughter N.R., or separate and inherited property belonging to Madigan, and thus there was no separate property of Rose's—which would be

otherwise subject to execution—inside the Rose family home.  In other words, none of the property inside the home was subject to the Execution.

54.     Rose and Rodgers-Rose did their best to follow Dormeyer and the Caudle civilians as they went through the Rose family home, but were overwhelmed by the sheer number of people inside their family home and therefore unable to do so fully and completely.

55.     Dormeyer seized Madigan's bedroom suite and sports cards collections, which were her separate and inherited property from her grandmother, despite being told that this was Madigan's property and therefore was not subject to seizure.

56.     Dormeyer seized separate property belonging to Rose and Rodgers-Rose's daughter N.R., including her riding tack.

57.     Dormeyer also seized (and/or ordered the seizure by the Caudle civilians of) marital property that had no economic value but did have sentimental value, such as wedding photographs of Rose and Rodgers-Rose that were hung on the wall.

58.     Dormeyer also seized (and/or ordered the seizure by the Caudle civilians of) marital property such as furniture.   Some Caudle civilians broke a leg of a sofa and broke a table when removing them.  Similarly, the Caudle civilians damaged the floors of the Rose family home when removing the family washer and dryer.

59.     Dormeyer also seized property of Rose which had *de minimus* or no monetary value, such as a pair of imitation Christian Louboutin shoes..

60.     Dormeyer attempted to seize Rodgers-Rose's work computers, but Rodgers-Rose informed Dormeyer that the computers belonged to Rodgers-Rose's employer.  Nevertheless, Dormeyer instructed Rodgers-Rose to take the computers off the desk and place them on the floor so that he could seize Rodgers-Rose's desk (also marital property).  Rodgers-Rose, who

was then a new employee during his probationary period, had to contact his supervisors and, embarrassed, take the afternoon off from work.

61.     One of the Caudle civilians (Caudle's sister Cayenne) intentionally damaged sprinkler heads from the lawn, but stopped doing so when she became wet.

62.     After removing other marital property such as tables, chairs and lamps, Dormeyer came back into the Rose family home and said he would get a ladder to take down curtains.

63.     Angry at the ongoing intrusion of his family home, Rose ripped down the curtains and threw them out in the driveway, and asked Dormeyer if he was done.  Dormeyer told Rose and Sheriff Drury that he was done.  Rose closed the garage doors and locked the connecting interior door to the home.

64.     Chief Deputy Meredith then returned inside and performed another walk-through video of the Rose family home.

65.     Dormeyer then returned to the home, and demanded that Rose produce a small Louis Vuitton bag that Dormeyer accused Rose of hiding. In fact, this small bag was in plain view on a counter in the kitchen.  It was a fake Louis Vuitton bag that contained Rose's prescribed medication.  Rose emptied the fake bag, gave it to Dormeyer, and told him to "get the hell out of my house."

66.     Dormeyer left the Rose family home, and Rose locked the door.

67.     Chief Deputy Meredith finished his video recording and took photographs of everything that was seized.  Scott County has since shared some of those videos with Rose and Rodgers-Rose.  *See* Exhibit 3 (GH016534) and Exhibit 4 (GH016541).

68.     One of the Caudle civilians, Justin Scalino, drove Rose's truck down the driveway to where it meets the public roadway.  He then handed off Rose's truck to Caudle, who

14

drove off waving and laughing toward Rose.  On information and belief, Caudle drove the truck to the Ponder funeral home which was owned by the two business entities that he and Rose formerly co-owned.  On information, all of the marital property and N.R.'s separate inherited property were taken to the Ponder funeral home by the Caudle civilians.

69.    The following Monday July 15th, 2024, an official at First State Community Bank subsequently told Rose that the bank's attorney had contacted Sheriff Drury and informed him that the Sheriff's Department would be liable for any damage to the truck that the Sheriff's Department had allowed Caudle to drive off in.

70.    That day or the next, Chief Deputy Meredith repossessed the truck from the Ponder funeral home and took it the Scott County Sheriff's Office.  The Sheriff's Department also obtained a semi-truck and loaded up the seized property and transported them to a location next to the Scott County Jail.

71.    On July 26, 2024, Dormeyer filed with the trial court in the civil case a "Motion for Extension on Amended Execution Application and Order" requesting an extension of time until August 16, 2024 to "to seize any remaining personal property and all horses owned by Carl E. Rose."

72.    Rose promptly and repeatedly notified the Sheriff's Department that the seized property was not subject to execution because it was either marital property, or N.R.'s separate property, or Madigan's separate and inherited property.  Neither Rose nor Rodger-Rose filed a claim for exemption within 20 days as provided by statute, however, under RSMo. 513.445.

73.    Rose promptly and repeatedly filed motions and other documents such as affidavits with the trial court in the civil case providing notice that the seized property was not subject to execution because it was either marital property, N.R.'s separate property, or

Madigan's separate and inherited property.  For example, Rose filed *pro se* a "Motion for Stay of Execution Levy" on July 29, 2024, as well as a Notice of Appeal to the Missouri Court of Appeals for the Southern District of Missouri.

74.     The next day, on July 20, 2024, Rose filed a "Motion to Quash Seizure of Property."  Rose subsequently filed the same with the state appellate court, which remanded the motion to the trial court.  The trial court ultimately denied the motion on August 28, 2024.

75.     Madigan completed a sworn statement that her property was also seized pursuant to the Writ of Execution.  It was submitted to the levying officer from the Sheriff's Department and the trial court in the civil case.

76.     That is, the actual owners of the marital property, Rodgers-Rose's separate property, N.R.'s separate property, and/or Madigan's inherited and separate property fulfilled their procedural requirement to the Sheriff and the trial court in the civil case.

77.     First State Community Bank informed Rose that it intended to engage in additional process to repossess Rose's truck, which was the only asset that was seized that was titled in Rose's name only.  Since the bank had the superior lien, however, the truck was not subject to execution by Dormeyer and Caudle to satisfy any obligation of Rose's to Caudle.

78.     Nevertheless, despite repeated notice of objections, on Friday, September 20, 2024, an auction sale occurred at the Sheriff's Department parking lot.

79.     Rose attended the sale.  When he arrived around 8:45 a.m., Sheriff Drury, Chief Deputy Merideth, and other deputies were removing property from the semi-trailer and placing it all out on the parking lot in an area which was marked with orange cones.  Caudle and Dormeyer arrived before the sale began.

80.     Rose asked Chief Deputy Merideth if he had a copy of the appraisal report of the items.  Chief Deputy Merideth responded that no appraisal had been performed.

81.     Chief Deputy Merideth asked Rose if any of the property set out belonged to Madigan.  Rose pointed out a night table from Madigan's inherited bedroom suite.  Chief Deputy Meredith instructed a deputy to place that item back into the trailer, and informed Rose that Madigan's property would not be sold and would stay in the trailer holding the seized property.  For example, Chief Deputy Merideth asked Rose which lamp was part of Madigan's bedroom suite.  When Rose indicated that he was not sure, Chief Deputy Meredith directed that all six lamps be placed back into the trailer and were not to be sold.

82.     The first item auctioned off was Rose's truck.  Caudle had acquired a bidder number when he arrived, and began to bid on the truck.  Caudle and another man bid back and forth until the truck sold for $57,000 to Caudle.  Caudle and Dormeyer walked over to a tent where the Sheriff's Department was registering bidders and collecting funds to ask how Caudle would need to pay for the truck.  The two men then got into Dormeyer's BMW and left.

83.     The auction continued.  Most of the seized marital property sold for low dollar values, less than its replacement cost or reasonable re-sale value.  For example, a LG front load washer/dryer combo went for less than a few hundred dollars.  Some items received no bids, on inference because they had no market value.  Others sold for nominal value.  A green extension cord, which was not on the Sheriff's inventory, sold for one dollar.

84.     At the end of the sale, Chief Deputy Merideth complied everything not sold individually and auctioned it off for less than $150.  That included a leather sectional sofa which was marital property, and which Rose and Rodgers-Rose had purchased for $5,300 approximately four years beforehand.

85.     One of the bidders then gifted the property that he had purchased to Rose and Rodger-Rose.  That property included wooden wall art, pictures, the LG washer/dryer, Rose's mother's camera, and living room furniture.

86.     Caudle and Dormeyer returned, and paid for Rose's truck with commercial paper under the payor "Southern Funeral Services, Inc."

87.     Chief Deputy Merideth informed Rose that Madigan could come and retrieve her property from the trailer.  Rose took possession of Madigan's property. Sheriff Drury also permitted Rose to obtain certain personal items from Rose's truck that had been sold, including his social security card and birth certificate, his mother's death certificate, checkbooks, and clothing items

88.     Rose asked for a copy of the return, including a list of who purchased which items and for how much.  Rose was told that the return would be made available to him the next week.  As Dormeyer was leaving he stated to Chief Deputy Merideth "see you next time."  Chief Deputy Merideth replied: "I hope there isn't a next time" and laughed.  Dormeyer then stated: "oh there will be."

89.     A few days later, upon his request, Rose was provided by the Sheriff's Department with a written breakdown of the proceeds of the sale.  After costs, fees and the bank lien on Rose's truck, the entire sale proceeds to the creditors totaled $2,470.84.  This creates the reasonable inference that Dormeyer and Caudle orchestrated the search and seizure not for the legitimate purpose of substantially satisfying any lien, but rather for an improper purpose to harass, annoy and embarrass Rose, Rodgers-Rose and their daughter N.R.

90.     One of the seized items was a fake Rolex.  The woman who purchased the fake Rolex from the Sheriff at the auction subsequently filed a claim against the Sheriff for selling a fake Rolex as the inventory represented that the watch as a "Rolex watch with box and charger."

### Unreasonable Search and Seizure

91.     Respect for the sanctity of the home has been embedded in our country's traditions since the origins of the Republic.[5]  It was unreasonable for Dormeyer and the Caudle civilians to search the Rose family home in order to seize property, even if it was authorized and personally supervised by Sheriff Drury and Chief Deputy Meredith, as any such authorization was itself unreasonable since the Execution Application and Order was directed by the Circuit Court only to the Sheriff pursuant to clearly-established Missouri law.

92.     It was unreasonable for Dormeyer and the Caudle civilians to seize marital property, N.R.'s separate property and Madigan's separate and inherited property since they had notice that this property was not the individual separate property of Rose.  Further, it was unreasonable for Sheriff Drury and Chief Deputy Meredith to permit the seizure since they too had notice that this property was not the individual separate property of Rose and therefore not subject to seizure.

93.     The personal property seized was identifiable either as marital property, Rodgers-Rose's property, N.R.'s separate property, or Madigan's separate and inherited property, and therefore not typically the sort of property that would be owned by Rose but not by rather both spouses as tenants by the entirety, or by N.R. as a minor child, or by a third party such as Madigan.

---

[5] *Coates v. Powell,* 639 F.3d 471, 477-78 (8th Cir. 2011) (Shepherd, J., concurring part and dissenting in part) (quoting *Payton v. New York,* 445 U.S. 573, 601(1980)).

94.    On inference, although Sheriff Drury and Chief Deputy Meredith may have consulted the Prosecuting Attorney and the County Attorney, any advice they were given that marital property, or Rodgers-Rose's and N.R.'s separate property, was subject to execution was unreasonable (as well as legally wrong) and therefore not a reasonable mistake of fact or law.

95.    Under the circumstances, a zealous creditor's request for measures clearly exceeding those authorized by the Scott County Circuit Court should have given Sheriff Drury and Chief Deputy Meredith pause to reassess their actions more carefully or to seek additional legal advice.  There were no exigent circumstances.

96.    Although this was not a criminal matter, there was no probable cause or arguable probable cause for each defendant knowingly to participate in or direct the seizure of either marital property, or Rodgers-Rose's and N.R.'s separate property.

<u>**Clearly Established Law**</u>

97.    On July 12, 2024, it was clearly established under Missouri law that marital property held under tenancy by the entirety is not subject to seizure under a civil judgment against one spouse.  Further, when spouses jointly own property, it is presumed to be held as a tenancy by the entirety.  That presumption can only be rebutted if the weight of the evidence leaves a trial judge with no doubt that the property was not held as a tenancy by the entirety.[6]

98.    On that date, it was also clearly established that separate property belonging to a spouse or a child is exempt from seizure from a civil judgment against the other spouse/parent.

99.    On that date, it was clearly established by the Supreme Court of the United States, and a robust consensus of cases from multiple circuits (including the Eighth Circuit), that it is

---

[6] *Capital Bank v. Barnes,* 277 S.W.3d 781, 782 (Mo. App. S.D. 2009); *but see Coonts v. Potts,* 316 F.3d 745, 751 (8th Cir. 2003).

unreasonable for the police to permit third parties to be present during searches of a private home.[7]  This was not a case where narrow exceptions applied, such as the presence of the third parties being necessary to identify stolen property, such that the presence of the third parties was necessary to aid in performing the Execution.  Dormeyer and Caudle had no superior knowledge of which property in the marital home belonged solely to Rose than the Sheriff or his deputies.

100.    Furthermore, given that the property seized was known to be either marital property, or separate property owned by Rodgers-Rose or N.R., then searches conducted for harassment purposes may subject officers to liability.[8]

101.    Individual civilian parties such as Dormeyer and Caudle lack qualified immunity as they are not government officials.

102.    Dormeyer and Caudle are liable since they acted "recklessly or with gross indifference" to Plaintiffs' and N.R.'s rights to be free from unreasonable searches of their home and the unreasonable seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property.[9]

103.    Dormeyer and Caudle are liable under 42 U.S.C. § 1983 since they were willing participants in a joint action with public servants acting under color of state law.[10]  That is because here there was agreement or meeting of the minds between Dormeyer, Caudle and the

---

[7] *Wilson v. Layne,* 526 U.S. 603 (1999) (police violated Fourth Amendment by allowing news media to accompany them into residence during execution of search warrant); *Buonocore v. Harris,* 134 F.3d 245 (4th Cir. 1998); *Bills v. Aseltinem,* 52 F.3d 596 (6th Cir. 1995) (court properly submitted to jury issue of whether third party was unreasonably invited to the search for an improper purpose).

[8] *Benigni v. City of Hemet,* 879 F.2d 473 (9th Cir. 1998) (repeated and harassing checks of tavern).

[9] *See Audio Odyssey, Ltd. v. Brenton First Nat. Bank,* 245 F.3d 721 (8th Cir. 2001), relying in part on *Jordan v. Fox, Rothschild, O'Brien Frankel,* 20 F.3d 1250, 1278 (3d Cir. 1994); *see also Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 537 (8th Cir. 1999).

[10] *See Miller v. Compton,* 122 F.3d 1094, 1098 (8th Cir. 1997).

Caudle civilians (private actors) and Sheriff Drury and Chief Deputy Merideth for Dormeyer, Caudle and the Caudle civilians to seize marital property, and Rodgers-Rose's and N.R.'s separate property, and a corresponding violation of plaintiffs' and N.R.'s rights under the Fourth Amendment.[11]

104.    Dormeyer was acting at all times within the scope and course of his duties to Caudle as Caudle's attorney.  Neither Dormeyer nor Caudle, however, was acting as a private individual engaged in public service, was acting in furtherance of government work, or was hired to do the government's work.[12]

105.    Since Plaintiffs assert their federal civil rights claims against each defendant only in their individual capacities, then each defendant lacks official or sovereign immunity.[4]

106.    Missouri has abrogated common law immunity for Sheriff's deputies who refuse or neglect to execute or levy.  RSMo. 513.340.  Missouri courts have held that the duty to execute and levy is ministerial.[13]  But that does not rebut the Missouri presumption of tenancy by the entirety, particularly where as here the Judgment creditor never described the property with particularity other than certain motor vehicles on the Execution Application and Order.  Plaintiffs cannot find authority that holds that Missouri permits shifting the burden onto married couples to "seize first and object later" where a judgment applies only to one spouse as debtor.  Nor do the ordinary statutory exemptions apply to the presumption of tenancy by the entirety; the two concepts are unrelated.  *See, e.g.,* RSMo. 513.430; 513.440; 513.475; 513.480.

---

[11] *See Mershon v. Beasley,* 994 F.2d 449, 451 (8th Cir. 1993).
[12] *See Filarsky v. Delia,* 566 U.S. 377, 385 (2012).
[13] *Duvall v. Tawney,* 323 S.W.3d 804, 809 (Mo. App. E.D. 2010).

### Damages

107.    Each Plaintiff suffered loss of either marital property or separate property not subject to execution.

108.    Each Plaintiff suffered garden-variety emotional distress, and was upset and felt violated all as a direct result of the knowing and unlawful search of their home under the agreement between Dormeyer and Caudle with Sheriff Drury and Chief Deputy Meredith.

109.    Each Plaintiff suffered garden-variety emotional distress, and was upset and felt violated all as a direct result of the knowing and unlawful seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property.

110.    Each Plaintiff distrusts and fears the legal system, including judges and law enforcement, all as a direct result of the seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property.

### Attorney's Fees and Costs

111.    In pursuit of their § 1983 civil rights claims, Plaintiffs are incurring reasonable attorney's fees, taxable costs, and non-taxable costs, each compensable under 42 U.S.C. § 1988.

### Count I – Unreasonable Search and Seizure by each individual Defendant

112.    Plaintiffs incorporate all prior paragraphs.

113.    Each individual Defendant actively participated in the search of the Rose family home.

114.    Each individual Defendant actively participated in the knowing seizure by Dormeyer, Caudle and the Caudle civilians of marital property, and of Rodgers-Rose's and N.R.'s separate property from the Rose family home, despite notice that such property was not the separate individual property of Rose subject to execution.

115.    The search and seizure were each unreasonable and not necessary for any lawful purpose under the circumstances conducted.

116.    Each individual Defendant acted under color of law.

117.    As a direct result, each Plaintiff and N.R. was injured.

**Punitive Damages**

118.    Each individual Defendant's acts in personally directing the search of the Rose family home and the seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property, were knowing, malicious or recklessly indifferent to the Fourth Amendment rights of each Plaintiff and N.R. to be free from unreasonable searches and seizures.

**Prayer**

WHEREFORE Plaintiffs Carl Rose and Drew Rodgers-Rose, individually and as next friends of their minor daughter N.R., pray the Court enter a judgment for Fourth Amendment unreasonable search and seizure against each individual Defendant in his individual capacity; award Plaintiffs their actual and punitive damages; award Plaintiffs their taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**Count II – Civil Conspiracy**

119.    Plaintiffs incorporate all prior paragraphs.

120.    Each individual Defendant had the object to accomplish an unreasonable search of the Rose family home and to seize property not reasonably subject to seizure including marital property and the separate property of third parties.

121.    Each individual Defendant had a meeting of the minds on the object and course of action to be taken.

122.    Each individual Defendant took one or more overt unlawful acts.

123.    Each individual Defendant caused a deprivation of each Plaintiff and N.R.'s rights to be free from unreasonable searches of the Rose home by Dormeyer and the Caudle civilians and knowing and unreasonable seizures of marital or separate property that was not subject to the Execution under the Fourth Amendment.

124.    Each individual Defendant acted under color of law.

125.    As a direct result, each Plaintiff and N.R. was injured.

## Punitive Damages

126.    Each Defendant's acts in conspiring to search the Rose family home and to seize marital property, and Rodgers-Rose's and N.R.'s separate property, were knowing, malicious or recklessly indifferent to the Fourth Amendment rights of each Plaintiff and N.R. to be free from unreasonable searches and seizures.

## Prayer

WHEREFORE Plaintiffs Carl Rose and Drew Rodgers-Rose, individually and as next friends of their minor daughter N.R., pray the Court enter a judgment for civil conspiracy against each individual Defendant in his individual capacity; award Plaintiffs their actual and punitive damages; award Plaintiffs their taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

## Count III –*Monell* liability for Scott County

127.    Plaintiffs incorporate all prior paragraphs.

128.    Sheriff Drury is the elected Sheriff of Scott County and its final policymaker.

129.    The knowing seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property, was unreasonable

130.    It was clearly established that the active participation of Dormeyer, Caudle and the Caudle civilians was unreasonable.

131.    Sheriff Drury as final policymaker for Scott County directly and actively oversaw and permitted the search of the Rose family home and the seizure of marital property, and of Rodgers-Rose's and N.R.'s separate property, and the direct and active participation of Dormeyer, Caudle and the Caudle civilians therein, such that it was the policy of Scott County to allow the search and seizure.

132.    As a direct result, each Plaintiff and N.R. was damaged.

**Prayer**

WHEREFORE Plaintiffs Carl Rose and Drew Rodgers-Rose, individually and as next friends of their minor daughter N.R., pray the Court enter a judgment for *Monell* liability against Defendant Scott County; award Plaintiffs compensatory damages; award Plaintiffs their taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just and reasonable.

Dated: February 14, 2025                  Respectfully submitted,

*Counsel for Plaintiffs Carl Rose and Drew
Rodgers-Rose, individually and as next friends of
their minor daughter N.R.*

/s/ Hugh A. Eastwood
Hugh A. Eastwood, 62058MO
8112 Maryland Ave., Suite 400
St. Louis, Missouri 63105-3700
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

/s/ Christopher R. Hoell
Christopher R. Hoell, 54011MO
7911 Forsyth Blvd., Ste. 300
St. Louis, Missouri 63105-3825
crh@hoell-law.com
314-441-6559
314-470-9934 eFax