UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CARL E. ROSE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-00035-SNLJ |
| | ) | |
| SHERIFF WES DRURY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' former Sheriff Wes Drury, former Chief Deputy Ron Merideth, and Scott County, Missouri's motion to dismiss plaintiffs' first amended complaint [Docs. 14, 15]; defendant Phil R. Dormeyer's motion to dismiss plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [Docs. 23, 24]; and, defendant John Caudle's motion to dismiss plaintiffs' amended complaint [Docs. 28, 29]. Plaintiff opposes all motions in an omnibus memorandum in opposition. [Doc. 32]. For the reasons set forth below, the motions to dismiss plaintiffs' amended complaint are GRANTED.

### I.    PROCEDURAL BACKGROUND

Plaintiffs filed the instant action on February 14, 2025, alleging violations of their civil rights under 42 U.S.C. § 1983. [Doc. 1]. Plaintiffs then filed an amended complaint on March 21, 2025, alleging violations of their civil rights under 42 U.S.C. § 1983 for unreasonable search and seizure by each individual defendant, civil conspiracy against each individual defendant, and *Monell* liability against Scott County, Missouri. [Doc.

41].  The individual defendants are being sued only in their individual capacities.  [*Id.*].  Plaintiffs' amended complaint seeks actual and punitive damages, as well as taxable costs and reasonable statutory attorney's fees.  [*Id.*].  Defendants have all filed their respective motions to dismiss plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  [Docs. 14, 15, 23, 24, 28, 29].

## II.    FACTUAL BACKGROUND

The following is a summary of plaintiffs' account of the events.  Plaintiff Carl E. Rose (hereinafter "Rose") was a police officer and sheriff's deputy from 2011 through 2019.  [Doc. 41 at ¶15].  After leaving the sheriff's department, Rose joined with business partner, defendant John Caudle (hereinafter "Caudle"), to form Southern Funeral Services, Inc. and 2BF Properties, LLC.  [*Id.* at ¶16].  Together they acquired two funeral homes and real estate in Sikeston, Missouri and East Prairie, Missouri.  [*Id.*].  In 2022, Rose and Caudle had a falling out relating to Rose's uses of business funds.  [*Id.* at ¶18].  As a result of that falling out, Caudle, individually and on behalf of the two companies, filed a civil lawsuit against Rose in Scott County Circuit Court, Case No. 23-SO-CV00115.  [*Id.* at ¶19].  Attorney Phil Dormeyer (hereinafter "Dormeyer") represented Caudle and the two companies in that lawsuit.  [*Id.*].

A consent preliminary injunction was issued in the Scott County Circuit Court case on December 6, 2023.  [*Id.* at ¶20].  There was a subsequent dispute between the parties as to whether Rose had complied with all of the terms of the injunction order.  [*Id.* at ¶21].  As a result, a show cause order was issued and the contempt motion was set for hearing on February 28, 2024.  [Doc. 24-3].  In addition to the civil dispute, Rose was

2

also charged by a special prosecutor from Dunklin County with felony criminal conduct related to the financial transactions in the business dispute between Rose and Caudle. [Doc. 41 at ¶23].

The civil contempt hearing set for February 28, 2024, was continued to April 11, 2024. [Doc. 41 at ¶25]. Shortly before the rescheduled hearing, Rose's attorneys sought leave of court to withdraw. [*Id.*]. Rose then sought to continue the civil contempt hearing again. [*Id.*]. The trial court denied his request for a continuance. [*Id.* at ¶26]. On April 11, 2024, Rose appeared *pro se* for the civil contempt hearing. [*Id.*]. Rose attempted to continue the hearing again, but his request was denied. [*Id.*]. The hearing proceeded. [Id.]. Rose participated in the hearing in the morning, but he chose not to return after lunch for the rest of the hearing. [*Id.*]. The trial court took the matter under advisement. [*Id.* at ¶27].

On May 10, 2024, the trial court entered a civil judgment in favor of Caudle and against Rose after finding that Rose had not complied with Section D of the December 2023 consent injunction, had violated various fiduciary duties to Caudle and the two entities, had forged loan documents for two business vehicles, and had diverted business funds for personal use. [*Id.* at ¶28]. The civil judgment was for $396,664.86 plus sanctions of $10,000.00 and attorney's fees of $38,919.48. [*Id.* at ¶30]. Rose attempted to appeal the matter to the Missouri Court of Appeals twice, but both appeals have been dismissed. [*Id.* at ¶31]. Following the entry of the civil judgment, Caudle sought to collect the judgment amount against Rose with garnishment and execution applications to various local banks. [*Id.* at ¶32].

3

The matters at issue in the amended complaint appear to have then arisen on July 12, 2024, and thereafter. Rose alleges that on July 12, 2024, then Sheriff Drury and Chief Deputy Merideth arrived at his residence and gave him two copies of execution paperwork from the civil judgment. [*Id.* at ¶34]. The execution application and order was completed and signed by Dormeyer and described the property to be seized as:

> All Debtor's property at 106 Jennings Lane, Sikeston, MO 63801, including Debtor's personal property in Debtor's possession, money, all tangible property, riding law mower, firearms, furniture, jewelry, appliances, horses, saddles, foals, and horse semen, see EX. A 2022 GMC DENALI CREW CAB VIN 1Gt49WBY9NF17139J and any other motor vehicle in debtor's name, see EX. B. All Debtor's interest and share in any business owned by Carl E. Rose, See EX. C.

[*Id.* at ¶35].

The trial court signed a judgment that provided:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT upon entry of the Execution Application and Order, filed contemporaneously with the Court, that the Scott County Sheriff may enter upon the premises of 106 Jennings Lane, Sikeston MO, 63801, including but not limited to, entry into the residential premises, to levy Defendant's personal property to satisfy Judgment; and, that the Scott County Sheriff may enter onto the premises of and 110 Jennings Lane, Sikeston, MO, 63801 to levy Defendant's personal property, including horses, vehicles, and personal property kept on the premises of 110 Jennings Lane, Sikeston, Missouri to satisfy Judgment.

[*Id.* at ¶36].

Rose alleges that Sheriff Drury and Chief Deputy Merideth indicated they had never had an execution order similar to this and they were not sure exactly what property was to be seized. [*Id.* at ¶39]. Rose further alleges that he was told at that time that Dormeyer and

Caudle were coming to the property for the execution, but that Rose's truck would definitely be taken. [*Id.* at ¶39].

About this same time, Rose alleges that his husband, Drew Rodgers-Rose (hereinafter "Rodgers-Rose"), came outside while Rose called his criminal defense attorney Jacob Zimmerman for advice. [*Id.* at ¶40]. Chief Deputy Merideth allegedly explained to Rodgers-Rose that there was a delay because they were unsure how to exactly proceed since they were not used to an execution order in the same form as what they had at that time. [*Id.*]. Rose alleges that the sheriff's department contacted the Scott County prosecuting attorney and the Scott County attorney to seek legal advice on how to proceed even though Rose alleges that the sheriff's department had previously had a planning meeting with Dormeyer. [*Id.* at ¶¶40, 41].

Shortly thereafter, Rose alleges that Dormeyer arrived and advised Rose that he would be taking everything and that he needed Rose to surrender the keys to Rose's truck. [*Id.* at ¶42]. Rose alleges that he informed Dormeyer that the truck had a superior lien with First State Community Bank but that Dormeyer pressured him to give up the keys to the truck. [*Id.* at ¶¶43, 44].

At this point in time, Rose alleges that Sheriff Drury, Chief Deputy Merideth, Detective Williams, Captain Danny Finley, and Dormeyer were present. [*Id.* at ¶45]. Chief Deput Merideth informed Rose that they would go through the home with a GoPro camera on and take an inventory before the execution. [*Id.*]. Rose then alleges that Caudle and several other civilians wearing "Caudle for Coroner" election t-shirts also arrived at the residence. [*Id.* at ¶46]. Rose alleges that he told Sheriff Drury that under

no circumstances was Caudle or any of the other civilians allowed on his property.  [*Id.* at ¶47].

Chief Deputy Merideth and Detective Williams then went through the residence taking video and photographs.  [*Id.* at ¶48].  Rose alleges that Rodgers-Rose told Sheriff Drury and Chief Deputy Merideth that the property inside the residence was not the separate and individual property of Rose but was actually their marital property.  [*Id.* at ¶49].  Rose alleges these objections and explicit objection to the "search and seizure" were repeated multiple times by both himself and Rodgers-Rose to no avail.  [*Id.* at ¶51].  Additionally, Rose alleges that objections were made for certain personal property items that belonged to Rose and Rodgers-Rose's minor daughter, N.R., and Abigail Madigan.  [*Id.* at ¶¶52, 53].  Again, Rose alleges that no one listened and that such personal property was taken.  [*Id.* at ¶¶56, 57].

Once the initial inventory was complete by the sheriff's department, Dormeyer, Caudle, and the other civilians entered the residence and started taking property.  [*Id.* at ¶50].  Dormeyer, Caudle, and the other civilians took property alleged to be Abigail Madigan's [*Id.* at ¶56]; property alleged to belong to Rose and Rodgers-Rose's minor daughter N.R. [*Id.* at ¶57]; marital property that had only sentimental value and no economic value (i.e., wedding photographs, etc.) [*Id.* at ¶58]; marital property like furniture, appliances, and curtains [*Id.* at ¶¶59, 63, 64]; and, other property that had *de minimis* or no monetary value [*Id.* at ¶¶60, 66].  Once the execution was complete, Chief Deputy Merideth went back in the residence and did another video inventory.  [*Id.* at

¶65].  Chief Deputy Merideth also took photographs of everything that was taken.  [*Id.* at ¶68].

Rose alleges that when everyone was leaving, one of the civilians drove Rose's truck to the end of the driveway.  [*Id.* at ¶69].  He alleges that Caudle then got in the truck, waved at Rose, and drove off laughing.  [*Id.*].  Rose alleges that it is his belief that the truck and all of the personal property were taken to the Ponder funeral home, one of the two business entities that Caudle and Rose had formerly co-owned.  [*Id.*].

A few days after the execution was complete, First State Community Bank allegedly informed the sheriff's department that it would be liable for any damage to Rose's truck since the sheriff's department had allowed it to be taken and driven by Caudle.  [*Id.* at ¶70].  As a result, that day or the next, Chief Deputy Merideth took the truck from the Ponder funeral home to the Scott County Sheriff's office.  [*Id.* at ¶71].  The sheriff's department also loaded the seized personal property into a semi-trailer and transported it to a location near the Scott County jail.  [*Id.*].

On July 26, 2024, Dormeyer filed a motion for extension on amended execution application and order with the trial court requesting an extension until August 16, 2024 to "seize any remaining personal property and all horses owned by Carl E. Rose."  [*Id.* at ¶72].  Rose allegedly did not sit quietly as he made repeated notifications to the sheriff's department that the personal property taken was not subject to execution because it was either marital property, the separate personal property of their minor daughter, or the personal property of Abigail Madigan.  [*Id.* at ¶73].  Neither Rose nor Rodgers-Rose filed a claim for exemption within 20 days as provided by statute.  [*Id.*].  However, Rose did

7

file several motions and affidavits with the trial court (i.e., a motion for stay of execution levy and a notice of appeal) indicating that the seized property was not subject to execution because it was either marital property, separate personal property of their minor daughter, or separate personal property of Abigail Madigan. [*Id.* at ¶74]. Rose also filed a motion to quash seizure of property with both the trial court and the state appellate court. [*Id.* at ¶75]. The trial court denied Rose's motions. [*Id.*]. Rose alleges that in addition to the paperwork filed with the trial court that a sworn statement from Abigail Madigan was also submitted to the sheriff's department and the trial court. [*Id.* at ¶76].

Despite the objections, sworn statements, motions and notices, Rose alleges that an auction sale was scheduled for September 20, 2024, at the sheriff's department parking lot. [*Id.* at ¶79]. When Rose asked Chief Deputy Merideth if an appraisal report had been prepared for the personal property, he confirmed it had not been. [*Id.* at ¶81]. Then Chief Deputy Merideth asked Rose if any of the personal property that was being set out to sell belonged to Abigail Madigan. [*Id.* at ¶82]. Rose pointed out certain items which resulted in various pieces of personal property being put back in the semi-trailer and held from sale. [*Id.*].

Rose's truck was the first item auctioned off. [*Id.* at ¶83]. Caudle bought the truck and then left the auction. [*Id.*]. The auction continued thereafter. Rose alleges that most of the claimed marital property sold for low values or less than replacement cost or reasonable re-sale value. [*Id.* at ¶84]. At the end, Rose alleges that Chief Deputy Merideth combined everything that had not sold into one pile and auctioned that for less

than $150.00, even though it included a marital leather sectional sofa that had been purchased for $5,300.00.  [*Id.* at ¶85].

After the auction was complete, one bidder gifted several items back to Rose and Rodgers-Rose like wooden wall art, pictures, the washer/dryer, Rose's mother's camera, and living room furniture.  [*Id.* at ¶86].  Further, Chief Deputy Merideth allowed Rose to take possession of Abigail Madigan's personal property as well as collect his personal items out of his truck that had been sold.  [*Id.* at ¶88].  Rose asked for a copy of the return after the auction, including a list of who purchased which items and for how much.  [*Id.* at ¶89].  Rose was allegedly told that it would be made available to him the following week.  [*Id.*].  A few days later, Rose was provided with a written breakdown by the sheriff's department allegedly identifying the total net sale proceeds to Caudle and the businesses to be $2,470.84.  [*Id.* at ¶90].

## III.    LEGAL STANDARD

The purpose of a Federal Rule of Civil Procedure Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of a complaint to eliminate those actions "which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity."  *Young v. City of St. Charles*, 244 F.3d 623, 527 (8th Cir. 2001) *quoting Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).  In addressing a motion to dismiss, a court must view the allegations of the complaint in the light most favorable to the plaintiff.  *United States ex rel. Ambrosecchia v. Paddock Laboratories, LLC*, 855 F.3d 949, 954 (8th Cir. 2017).  A complaint must be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a

claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating the prior "no set of facts" standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). A complaint must set forth factual allegations which are enough to "raise a right to relief above the speculative level." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" is not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a court can infer from the factual allegations no more than a "mere possibility of misconduct," the complaint must be dismissed. *Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) *citing Iqbal*, 556 U.S. at 662.

As for a Federal Rule of Civil Procedure 12(b)(1), to establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged action, and it must be likely that the injury will be redressed by a favorable judicial decision. *Hawse v. Page*, 7 F.4th 685, 688 (8th Cir. 2021) *citing Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992). To survive a motion to dismiss for lack of jurisdiction, a plaintiff must allege sufficient factual matter, accepted as true, to support a reasonable and plausible inference that the elements of Article III standing are satisfied. *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018).

## IV.    DISCUSSION

### A. 42 U.S.C. § 1983 Generally

Plaintiffs filed this action pursuant to 42 U.S.C. § 1983, which was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Department of Social Services*, 436 U.S. 658, 685 (1978). To state a claim under 42

U.S.C. § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation of that right was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

## B. Subject Matter Jurisdiction and Standing under *Rooker-Feldman* Doctrine

The Defendants argue that this Court does not have subject matter jurisdiction based upon the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine recognizes that lower federal courts lack subject matter jurisdiction over challenges to state court judgments. *Ace Const. v. City of St. Louis*, 263 F.3d 831, 832 (8th Cir. 2001). Federal district courts are prohibited from exercising jurisdiction over appeals from state court decisions and general constitutional claims that are "inextricably intertwined" with specific claims already adjudicated in state court. *Id.* at 833. The doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The hallmark inquiry under the *Rooker-Feldman* doctrine is what the federal court is being asked to review and reject. *Id.* If a federal plaintiff asserts an allegedly illegal act or omission by an adverse party in obtaining and enforcing a state-court judgment, *Rooker-Feldman* does not bar jurisdiction. *See MSK EyEs Ltd. v. Wells Fargo Bank, Nat. Ass'n*, 546 F.3d 533, 539 (8th Cir. 2008) (claims are independent and not barred by *Rooker-Feldman* because they allege unlawful conduct only 'in seeking and executing

the [state] order); *see Riehm v. Engelking*, 538 F.3d 952, 965 (8th Cir. 2008) (*Rooker-Feldman* did not apply because claim was independent of the state court's judgment and alleged unconstitutional actions by defendants in seeking and executing the state court order).

Here, plaintiffs are <u>not</u> attempting to have this Court "'review, modify, or nullify' a final order of a state court". *Saudi Basic*, 544 U.S. at 283 *quoting Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 414 (1923). Rather, plaintiffs claim that the defendants violated their constitutional rights in their effort to enforce the execution order. Accordingly, this Court is being asked to review the way the defendants effectuated the execution order, not the validity or substance of the state court judgment. *Rooker-Feldman* does not bar these kinds of suits. Accordingly, defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) must be denied.

## D. Doctrine of *Res Judicata*

Defendants Caudle and Dormeyer allege that plaintiffs' claims should also be barred by *res judicata*. "The doctrine of *res judicata* applies to repetitive suits involving the same cause of action." *Lundquist v. Rice Mem'l Hosp.*, 238 F.3d 975, 977 (8th Cir. 2001). *Res judicata*, therefore, bars litigants from bringing claims on grounds that were raised or could have been raised when: (1) a court of competent jurisdiction rendered the prior judgment; (2) the prior judgment was a final judgment on the merits; and, (3) both cases involved the same cause of action and the same parties or their privies. *Banks v. Int'l Union Elec., Elec., Tech., Salaried and Machine Workers*, 390 F.3d 1049, 1052 (8th Cir. 2004). A claim is barred by *res judicata* if it arises out of the same nucleus of

12

operative facts as the prior claim. *Id.* For an affirmative defense like *res judicata* to provide a basis for dismissal under Federal Rule of Civil Procedure 12(b)(6), the affirmative defense must be "'apparent on the face of the complaint,'" which "'include[s] public records and materials embraced by the complaint' and 'material[s] attached to the complaint.'" *A.H. ex rel. Hubbard v. Midwest Bus Sales, Inc.*, 823 F.3d 448, 453 (8th Cir. 2016) *citing C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012).

Dormeyer and Caudle argue that this Court is barred from considering this case under the doctrine of *res judicata* because plaintiffs' claims arise out of the same "nucleus of operative facts" as those that were repeatedly raised in the *Caudle v. Rose* state court action. [Doc. 24 at p. 11; Doc. 29 at p. 15]. Dormeyer and Caudle also argue that plaintiff should be barred from attempting to relitigate challenges to the validity of the judgment, execution, and sale in satisfaction of the judgment. [Doc. 24 at pp. 11-12, Doc. 29 at p. 15]. The Court disagrees.

The claims plaintiffs assert here do not challenge the validity of the underlying state court judgment against, or the debt owed by, plaintiff Rose. Plaintiffs are not suing defendants for the return of the money collected from them pursuant to the enforcement of the execution of the judgment. Instead, plaintiffs are asserting independent claims under federal law against the defendants arising from the actions the defendants undertook in their collection efforts after the judgment was entered. The two cases do not arise from the same "nucleus of operative facts" as the defendants claim. Further, the parties in the two cases are not the same. Not all of the plaintiffs in this action were

13

parties in state court.  None of the defendants in this action, with the exception of Caudle, were parties to the action in state court either.

As the parties in this case differ from those in the state court action, and the claims in this case arise from a different nucleus of operative facts and do not challenge the state court judgment, *res judicata* does not apply.  Therefore, defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and *res judicata* must be denied

## C.  Failure to State a Claim

### 1.  *Unreasonable Search and Seizure – Fourth Amendment Violation*

Plaintiffs' claim in Count 1 is for unreasonable search and seizure by each defendant in violation of the Fourth Amendment.  Specifically, plaintiffs allege liability against defendants based upon (1) the participation of Dormeyer, Caudle, and Caudle's family members and staff in searching plaintiffs' family home and seizing property, as well as Caudle's presence at the edge of the family residence; and, (2) the defendants' seizure of marital and separate property.  All defendants contend that plaintiffs' claim must be dismissed because they have failed to state a claim upon which relief may be granted.  Additionally, Sheriff Drury and Chief Deputy Merideth contend that they are entitled to qualified immunity and absolute immunity.

#### a.  *Fourth Amendment Violation against Sheriff Drury and Chief Deputy Merideth*

##### i.  *Absolute Immunity*

Non-judicial officials whose official duties have an integral relationship with the judicial process are entitled to absolute immunity for their quasi-judicial conduct.  *Henry*

*v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986).  Although immunity is normally extended to those performing discretionary and not ministerial acts, individuals performing ministerial acts under judge's supervision and intimately related to a judicial proceeding have quasi-judicial immunity.  *Id.*; *see Waits v. McGowan*, 516 F.2d 203, 206 (3d Cir. 1975) (holding that official entitled to absolute immunity afforded judge if "he is performing a ministerial function at the direction of the judge"); *see also Duba v. McIntyre*, 501 F.2d 590, 592 (8th Cir. 1974) (holding that quasi-judicial absolute immunity extended to police and other court officers "for purely ministerial acts where they do nothing other than perform orders issuing from a court").  Thus, police officers, sheriffs, and other court officers who act in reliance on a facially valid court order are entitled to quasi-judicial immunity from suit under § 1983 for damages.  *See, e.g., Tymiak v. Omodt*, 676 F.2d 306, 308 (8th Cir. 1982) (sheriff acting pursuant to state court order immune from § 1983 suit for damages); *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) ("Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed in that order."); *Meyer v. Curran*, 397 F. Supp. 512, 519 (E.D. Pa. 1975) (finding that a sheriff who seized plaintiffs' property pursuant to writ of execution issued by state court immune from suit for damages).

Here, Sheriff Drury and Chief Deputy Merideth were at all times acting pursuant to an official court order to enforce a validly entered judgment when they performed the allegedly wrongful acts of which the plaintiffs now complain.  It is difficult to think of a

15

task more intimately related to a judicial proceeding than that of enforcing a money judgment entered by a court.  Since Sheriff Drury and Chief Deputy Merideth were legally required to levy the writ of execution that was delivered to them, they clearly acted in furtherance of their "official duties in aid of the court." *Henry*, 808 F.2d at 1239 quoting *Ashbrook v. Hoffman*, 617 F.2d 474, 477 (7th Cir. 1980); s*ee also* § 513.040 RSMo; § 513.340 RSMo.; Mo. Sup. Ct. R. 76.05; Mo. Sup. Ct. R. 76.06.  At no time was it up to Sheriff Drury or Chief Deputy Merideth to exercise discretion in their execution of the writ on the property at 106 Jennings Lane, Sikeston, MO.  *Duvall v. Tawney*, 323 S.W.3d 804, 809 (Mo. App. E.D. 2010) ("it is not for a sheriff to determine whether or not to take property pursuant to a writ of execution based on a third party's claims that the property is marital").  The proper procedure for plaintiffs who wish to contest the legality of a court order enforcing a judgment is to appeal that order, appeal the underlying judgment, or seek post-deprivation remedies to claim exemptions or challenge the orders divesting them of possession of the property; but, it cannot be to sue the official responsible for its execution.

Based on the foregoing, Sheriff Drury and Chief Deputy Merideth are entitled to absolute immunity from suit for damages arising from their execution of the writ. Therefore, the claim against Sheriff Drury and Chief Deputy Merideth for an unreasonable search and seizure in violation of plaintiffs' Fourth Amendment rights must be dismissed.

ii.    *Qualified Immunity and Fourth Amendment Search and Seizure*

Even assuming absolute immunity did not apply as analyzed *supra*, Sheriff Drury and Chief Deputy Merideth would be entitled to qualified immunity.  "Qualified immunity shields public officials from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Watkins v. City of St. Louis, Missouri*, 102 F.4th 947, 951 (8th Cir. 2024).  "To overcome qualified immunity at the motion to dismiss stage, a plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).  Accordingly, in analyzing qualified immunity, this Court must determine whether plaintiffs' allegations present a claim that defendants violated well-established rights of the plaintiffs.  *Otey v. Marshall, et al.*, 121 F.3d 1150, 1155 (8th Cir. 1997).

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  *U.S. v. Jones*, 565 U.S. 400, 404 (2012).  A seizure of property under the Fourth Amendment occurs when there is some meaningful interference with an individual's possessory interest in that property.  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Meaningful interference includes the exercise of dominion and control over or destruction of the property.  *U.S. v. Va Lerie*, 424 F.3d 694, 702 (8th Cir. 2005) *citing Jacobsen*, 466 U.S. 109.  To establish a claim for seizure of

17

property under the Fourth Amendment, a claimant must plausibly allege that a seizure occurred and that it was unreasonable. *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999). "[A]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action." *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) *quoting Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

In the present case, it is undisputed that plaintiffs' property was "seized" for purposes of the Fourth Amendment when Sheriff Drury and Chief Deputy Merideth levied upon it pursuant to the writ of execution. The question is whether there was anything unreasonable about the seizure that would place it among those prohibited by the Fourth Amendment.

The Eighth Circuit has held that law enforcement officers do not violate the Fourth Amendment when they seize property pursuant to a facially valid writ of execution. *See Coonts v. Potts*, 316 F.3d 745, 750-51 (8th Cir. 2003) (deputies' actions in conducting levy on property under a "facially-valid writ of execution" was a reasonable seizure under the Fourth Amendment despite challenges to the writ's lawfulness); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536-37 (8th Cir. 1999) (deputy's erroneous seizure of boat and trailer while acting pursuant to a writ of execution did not support a viable Fourth Amendment claim). Here, Sheriff Drury and Chief Deputy Merideth were executing a valid writ. There is no evidence that they did not generally follow the state statutes and rules related to execution; and, in fact, they even contacted the Scott County

18

Prosecuting Attorney and the Scott County Attorney to seek legal advice before executing.

However, plaintiffs argue that the execution and seizure was unreasonable on 2 grounds:  (1) because Sheriff Drury and Chief Deputy Merideth allowed Dormeyer, Caudle, and Caudle's family and staff participate in the execution of the writ; and, (2) because Sheriff Drury and Chief Deputy Merideth allowed for seizure of marital and separate property.

 As it relates to the presence of Dormeyer, Caudle, and Caudle's family and staff during the execution of the writ, plaintiffs fail to cite to any legal authority directly on point that would hold that the presence of these other individuals invalidates a writ of execution or violates plaintiffs' Fourth Amendment rights.  While all parties cite to *Wilson v. Layne*, this Court does not find it truly persuasive because it relates to the reasonableness of the execution of an arrest warrant in a criminal proceeding with the presence of news reporters.  *Wilson v. Layne*, 526 U.S. 603, 610-11 (1999).

This Court finds more persuasive the authority for the proposition that in the civil context, the standards of reasonableness are less stringent than in the criminal context. *See e.g., Nixon v. Adm'r of Gen. Servs*., 408 F. Supp. 321, 366 (D.D.C. 1976), *aff'd*, 433 U.S. 425 (1977); *see e.g., Almeida-Sanchez v. United States*, 413 U.S. 266, 278-79 (1973) (Powell, J., concurring); *see e.g., Wyman v. James*, 400 U.S. 309, 321, 323-24 (1971); *Id.* at 344, n.4 (Marshall, J., dissenting); *see Owens v. Swan*, 962 F. Supp. 1436, 1440 (D. Utah 1997).  From the civil context, there are actually cases that have addressed the presence of third parties during the execution of a writ and have held that the presence of

those third parties did not invalidate or make unreasonable the entry into plaintiffs' home or the execution of the writ. *See Tift v. Snohomish County*, 764 F. Supp.2d 1247, 1252 (W.D. Wash. 2011) (holding that the presence of the judgment creditor's attorney does not invalidate or make unreasonable the entry into plaintiff's home or the execution of the writ); *see also Revis v. Meldrum*, 489 F.3d 273, 278-280 (6th Cir. 2007) (finding that plaintiff conceded that his personal property was constitutionally seized in executing the writs where deputies were accompanied by employee of law firm representing judgment creditor); *see e.g., Coonts v. Potts*, 316 F.3d 745, 749 (8th Cir. 2003) (finding that judgment creditor's employees took the items from the porch of the residence and loaded them in a moving truck and moved the items to judgment creditor's store). Accordingly, this Court finds that the presence of Dormeyer, Caudle, and Caudle's family and staff during the execution of the writ did not invalidate or make unreasonable the entry into plaintiffs' home or the execution of the writ.

In regard to plaintiffs' claim that the execution and seizure was unreasonable because Sheriff Drury and Chief Deputy Merideth allowed for seizure of marital and separate property, "it is not for a sheriff to determine whether or not to take property pursuant to a writ of execution based on a third party's claims that the property is marital." *Duvall*, 323 S.W.3d at 809. Additionally, at the time the execution of the writ on July 12, 2024, Sheriff Drury and Chief Deputy Merideth provided plaintiffs with a copy of the execution application and order and the judgment and order for entry on the premises to levy against the personal property. [Docs. 41-1, 41-2]. Attached to the execution application and order is a notice to judgment debtor that identifies a list of

exempt property and indicates that there is a process by which plaintiffs could have claimed various exemptions. *Id.* Therefore, the seizure occurred under a valid writ of execution and a post-deprivation remedy to claim exemptions was available to plaintiffs; and, as such, Sheriff Drury and Chief Deputy Merideth's actions in seizing marital and separate property was not unreasonable.

Based on the foregoing, although there was a seizure of plaintiffs' property, that seizure was not unreasonable. Accordingly, no violation of the Fourth Amendment exists; and, without a violation of the Fourth Amendment, Sheriff Drury and Chief Deputy Merideth are entitled to qualified immunity. Therefore, the claim against Sheriff Drury and Chief Deputy Merideth for an unreasonable search and seizure in violation of plaintiffs' Fourth Amendment rights must be dismissed.

### iii.    Conclusion

This Court finds Sheriff Drury and Chief Deputy Merideth are entitled to absolute immunity and qualified immunity. Therefore, the claim against Sheriff Drury and Chief Deputy Merideth for an unreasonable search and seizure in violation of plaintiffs' Fourth Amendment rights must be dismissed

### b.    *Fourth Amendment Violation against Dormeyer and Caudle*

The Fourth Amendment does not apply to private-citizen searches and seizures "unless that private citizen is acting as a government agent." *United States v. Stephen*, 984 F.3d 625, 629 (8th Cir. 2021) quoting *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004). "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the

Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *See Skinner v. Ry Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989). To resolve that question, the courts have typically considered several factors: (i) whether the government knew of and acquiesced in the citizen's conduct; (ii) whether the citizen intended to assist law enforcement; and, (iii) whether the citizen acted at the government's request. *Smith*, 383 F.3d at 705. Even though these are the primarily relevant factors, the ultimate issue still "necessarily turns on the degree of the Government's participation in the private party's activities." *See Skinner*, 489 U.S. at 614.

The first factor, knowledge and acquiescence, cuts in favor of a finding of agency. Sheriff Drury and Chief Deputy Merideth knew of and stood by during Dormeyer, and Caudle's seizure of property pursuant to the writ of execution.

The third factor, whether the government requested the challenged seizure, cuts against a finding of agency. There are no allegations or indications that Sheriff Drury and Chief Deputy Merideth asked or compelled Dormeyer or Caudle to perform the seizure of property pursuant to the writ of execution.

The final factor then is whether Dormeyer and Caudle intended to assist Sheriff Drury and Chief Deputy Merideth or instead acted to further their own purposes. Even when government officials know of and acquiesce in a seizure or property, the courts have generally been unwilling to impute agency where the private actor was not "motivated solely or even primarily by the intent to aid the officers" and where the government did not request the challenged seizure. *United States v. Highbull*, 894 F.3d

22

988, 992 (8th Cir. 2018) *quoting Smith*, 383 F.3d at 705.  This is precisely what transpired in the present case.  While Dormeyer and Caudle undoubtedly aided Sheriff Drury and Chief Deputy Merideth in seizing and moving the personal property pursuant to the writ of execution, there are no allegations or evidence suggesting that they were motived primarily by a desire to help the Sheriff and Chief Deputy.  Rather, the allegations and evidence indicate a compelling personal motive on Dormeyer and Caudle's part:  the seizure of personal property to be sold and applied to the judgment that had been entered against plaintiff.  Even if Dormeyer and Caudle had both public- and private-minded motives for aiding law enforcement, they were motivated at least as much by a compulsion to further their own private motives related to the civil monetary judgment as they were by any desire to aid the police.

Based on the foregoing, even though Sheriff Drury and Chief Deputy Merideth knew of and acquiesced in Dormeyer and Caudle's seizure of personal property pursuant to the writ of execution, Dormeyer and Caudle's seizure was not conducted at the government's request and was not undertaken solely or even primarily with the intent to aid Sheriff Drury and Chief Deputy Merideth.  Accordingly, Dormeyer and Caudle did not act as agents of the government; and, any claim against them for an unreasonable search and seizure in violation of plaintiffs' Fourth Amendment rights must be dismissed.

### 2. Civil Conspiracy

A conspiracy claim under 42 U.S.C. § 1983 requires a plaintiff to establish:  (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the

conspiracy; and, (3) the overt act injured the plaintiff. *Bonenberger v. St. Louis Metropolitan Police Dept.*, 810 F.3d 1103, 1109 (8th Cir. 2016). Plaintiff's failure to establish deprivation of any constitutional rights is fatal to his claim that there was a conspiracy to violate his constitutional rights. *Robbins v. Becker*, 794 F.3d 988, 997 (8th Cir. 2015). "Absent a constitutional violation, 'there is no actionable conspiracy claim.'" *Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003) quoting *Cook v. Tadros*, 312 F.3d 386, 388 (8th Cir. 2002). Accordingly, the motions to dismiss the claim against the defendants for civil conspiracy in Count II must be granted.

### 3. *Monell* Liability against Scott County, Missouri

In Count III, plaintiffs assert a municipal liability claim against Scott County, Missouri. A county cannot be held liable under 42 U.S.C. § 1983 simply because it employs someone who allegedly violated plaintiffs' rights. *Hamilton v. City of Hayti*, 948 F.3d 921, 929 (8th Cir. 2020). However, liability may attach if the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). Here, plaintiffs appear to argue against Scott County, Missouri under the official municipal policy theory under *Monell* because Sheriff Drury, as a final policymaker, oversaw and permitted a search of the home and seizure of alleged marital and separate property, as well as permitted Dormeyer, Caudle and the others to participate. [Doc. 41 at ¶¶128-133].

As discussed *supra*, plaintiffs have not sufficiently pled a deprivation of constitutional rights in Counts I and II and, therefore, their municipal liability claims

under *Monell* fail on this ground alone. *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016) ("In order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."). Even if plaintiffs had sufficiently plead a deprivation of a constitutional right, they have failed to allege the facts necessary to support a municipal liability claim.

Official municipal policy is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Barnett v. Short*, 129 F.4th 534, 545 (8th Cir. 2025) citing *Corwin*, 829 F.3d at 700. Thus, liability only attaches "where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* citing *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017). A plaintiff must show that (1) the local government entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Here, neither Scott County nor Sheriff Drury has authority and responsibility over the execution of a writ. Rather, the state court and the state statutes and rules dictate the process and procedure related to post-judgment execution proceedings. Thus, plaintiffs' complaint is devoid of sufficient allegations of any policy of Scott County that they claim led to a violation of their constitutional rights. Therefore, their *Monell* official policy claim fails.

## V.    CONCLUSION

Based upon the foregoing, this case will be dismissed in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions to dismiss [Docs. 14, 23, 28] are **GRANTED**.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED** without prejudice in its entirety and the Clerk of Court is **DIRECTED** to **CLOSE** the case.  A separate order of dismissal will accompany this Memorandum and Order.

**IT IS FINALLY ORDERED** that an appeal from this Order would not be taken in good faith.

Dated this 18th day of December, 2025.


_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE

26